**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM BRACEY,** | : | **CIVIL ACTION NO. 3:11-CV-2329** |
| | : | |
| **Petitioner** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **MARIROSA LAMAS,** *et al.,* | : | |
| | : | |
| **Respondents** | : | |

**<u>MEMORANDUM</u>**

This is a habeas corpus case filed pursuant to 28 U.S.C. § 2254.  Petitioner, William Bracey, seeks to vacate his 1995 conviction and sentence for first-degree murder in the Dauphin County Court of Common Pleas based on the Commonwealth's alleged failure to disclose relevant impeachment evidence as required by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and its progeny.  The petition was dismissed as untimely in 2012, but Bracey moved to reopen the case in 2015 pursuant to Federal Rule of Civil Procedure 60(b)(6).  Our late colleague, United States District Judge Edwin M. Kosik, denied the motion on February 5, 2016.  Bracey appealed, and on January 20, 2021, the United States Court of Appeals for the Third Circuit vacated and remanded for further consideration of Bracey's Rule 60(b)(6) motion, concluding that the court abused its discretion by failing to consider the impact of <u>Dennis v. Sec'y, Pa. Dep't of Corrs.</u>, 834 F.3d 263 (2016) (en banc) on the timeliness of Bracey's petition.  The case was reassigned to the undersigned on remand.  We will deny Bracey's Rule 60(b)(6) motion.

I. __Factual Background & Procedural History__

On June 8, 1994, Houston Sims was shot to death at the intersection of 18th Street and Regina Street in Harrisburg, Pennsylvania. Sims, who was in his car at the time he was shot, continued to drive his car for two blocks before crashing his car into a house at the intersection of 16th Street and Regina Street. Bracey was charged with first-degree murder and third-degree murder arising from Sims's death.

Trial commenced on May 15, 1995, in the Dauphin County Court of Common Pleas. (Doc. 45-1 at 2).[1] The first witness called to testify was Milagros Torres, a former resident of Harrisburg who resided at the intersection of 18th and Regina on the night that Sims was killed. Torres testified that she was in her bedroom when she heard a "pop, pop, like a gun." (Id. at 29). She immediately looked out her window and saw a young man shooting a gun into a car. (Id.) She then watched as the young man walked over to a bicycle that was parked by a nearby mailbox and rode the bicycle away. (Id. at 30).

Torres called the police and went down to the street. (Id. at 32). Observing that police officers were looking for spent shell casings from the shooting, she informed the officers where the shooting had occurred. (Id. at 33). The officers searched that spot and found shell casings exactly where Torres said they would. (Id.) Torres testified that she recognized the shooter as someone who she

---

[1] For ease of reference, we will use the CM-ECF page numbers appended to the top of the page on the court's public electronic docket when referencing the transcript of Bracey's trial.

frequently observed "hanging around" the mailbox at 18th and Regina.  (<u>Id.</u> at 34).

She identified Bracey as the shooter in a photo lineup shortly after the shooting and

identified him in court during trial.  (<u>Id.</u> at 34-36).

Jacqueline Jackson testified that she was sitting on the front steps of her

friend's house at 18th and Regina on the night Sims was killed.  (<u>Id.</u> at 60).  She

heard gunshots coming from Regina Street.  (<u>Id.</u> at 64).  She looked over and saw

someone shooting a gun into a car.  (<u>Id.</u> at 65).  The car began to drive away, but the

shooter walked behind the car and continued to shoot at it.  (<u>Id.</u> at 66).  Jackson

testified that she knew Bracey as a friend of her boyfriend, Sylvester Bell, and that

Bracey was the person she saw shooting at the car.  (<u>Id.</u> at 56-57, 66).

Jackson testified that after the shooting, Bracey walked over to the steps

where she and her friends were sitting.  (<u>Id.</u> at 67).  Jackson asked Bracey why he

had been shooting at the car and Bracey stated that the driver of the car had taken

drugs from him.  (<u>Id.</u> at 68-69).  Jackson testified that she talked to Bracey for 2-3

minutes after the shooting.  (<u>Id.</u> at 69).  She also testified that a man she knew by

the nickname "Tee-Tee" was present at 18th and Regina that night.  (<u>Id.</u> at 71-72).

During her testimony, Jackson acknowledged that her boyfriend, Sylvester

Bell, was in jail facing criminal drug charges and that she was motivated to testify

because she thought her testimony might help Bell.  (<u>Id.</u> at 58).  She also

acknowledged that she and Bell had a child together.  (<u>Id.</u> at 73).

The court next heard testimony from Thomas Plummer, Jr.[2]  Plummer testified that he goes by the nickname "Tee-Tee" and that he and Bracey had known each other for twelve years at the time of trial.  (Id. at 75).  Plummer acknowledged that he had pending criminal charges for unlawful carrying of firearms, possession of narcotics with intent to deliver, unlawful delivery of cocaine, and aggravated assault.  (Id. at 76).  He further acknowledged that he had agreed to a negotiated plea with the Commonwealth whereby he would receive a sentence of 4-12 years imprisonment on the drugs and firearm charges and that the aggravated assault charge would be dismissed.  (Id.)

Plummer testified that he, Bracey, and another man named William Hinton, who went by the nickname "Eggie," were at 18th and Regina on the night of Sims's death drinking beer.  (Id. at 81).  Plummer testified that Bracey was selling drugs that night.  (Id.)  As they were sitting there, a car pulled up, Bracey went to the car, and Plummer saw the driver of the car reach down under his seat.  (Id. at 83-84).  Plummer then saw the driver's "hand come up to the window . . . [l]ike he was going for something."  (Id. at 85).  The car started to drive away, at which point Plummer heard gunshots.  (Id.)  Bracey ran towards the car.  (Id. at 87).  As Bracey was running, Plummer heard more shots.  (Id.)  The car continued down Regina Street.  (Id. at 88).  Plummer walked down Regina Street and saw that the car had crashed into a house.  (Id.)

---

[2] Thomas Plummer, Jr. and his father, Thomas Plummer, Sr., both testified as witnesses in Bracey's trial.  The court will refer to Thomas Plummer, Jr. as "Plummer" and Thomas Plummer, Sr. as "Plummer, Sr."

Plummer did not see Bracey again on the night of Sims's death, but he testified that he saw Bracey again a day or two after the shooting.  (Id.)  Bracey told Plummer that the driver of the car had reached out like he wanted to take something from Bracey and that Bracey fired his gun for that reason.  (Id. at 89).  Bracey told Plummer that he had seen a gun in the car.  (Id.)  Plummer never observed Sims holding a gun and did not observe a gun in Sims's car.  (Id. at 90).  Plummer testified that he saw Bracey again at the home of a mutual acquaintance named Rinell Sanford some days after the shooting.  (Id. at 91).  On cross-examination, Bracey's counsel pressed Plummer on how much alcohol he had consumed on the night of the murder.  (Id. at 100-01).  Plummer testified that he had consumed two 22-ounce bottles of beer but that he was not drunk.  (Id. at 101).

The Commonwealth's next witness was Sylvester Bell.  Bell testified that he was incarcerated in Dauphin County Prison at the time of trial on pending charges of delivery or possession with intent to deliver cocaine.  (Id. at 104).  Bell acknowledged that he had reached a plea agreement in exchange for his testimony:

> Q.     Now as part of your testifying here today your attorney and the District Attorney's Office worked out a plea agreement for you to come and testify.  Is that right?
> A.     Yeah.
> Q.     And as part of that plea agreement you are going to plead guilty to the charges that you have against you, and you are going to receive a sentence of 2 to 4 years in jail, and if you are eligible, you would receive what is known as the Boot Camp program.  Is that correct?
> A.     Yeah.

(Id. at 105).

Bell testified that he had known Bracey since they were in middle school together.  (Id. at 106).  On the night of Sims's death, Bell was at the intersection of

16th Street and Market Street when his girlfriend, Jacqueline Jackson, contacted him on his beeper and told him to come to 18th and Regina.  (Id.)  On his way to 18th and Regina, Bell observed Sims's car crashed into a house at 16th and Regina.  (Id.)  When he got to 18th and Regina, he saw Jackson and Bracey there, though he and Bracey did not speak that night.  (Id. at 107-08).

Sometime shortly after the shooting, Bell saw Bracey and Plummer at Rinell Sanford's home at the intersection of 18th Street and Park Street.  (Id. at 108). While they were at Sanford's home, Bracey stated that he shot the driver of the car that had crashed at 16th and Regina because the driver had stolen some cocaine from him.  (Id. at 109).

The court next heard testimony from four law enforcement officials who were involved in the investigation of Sims's death.  Leroy Lucas, an officer with the Harrisburg Police Department's forensic unit, testified that he observed two bullet holes in the trunk of Sims's car and that he found five spent shell casings at the intersection of 18th and Regina.  (Id. at 129-31).  Lucas testified that the gun used to shoot Sims was never found and that no guns or drugs were found in Sims's car. (Id. at 151, 154).

Alfredo Rivera, an officer with Harrisburg Police Department's K-9 patrol unit, testified that he was one of the first officers to respond to the scene of the car crash at 16th and Regina.  (Id. at 156).  Rivera testified that when he arrived at the scene, Sims was in the car and the owner of the house at which the car had crashed was present, but no other individuals were present.  (Id. at 157).

Dr. Wayne Ross, a forensic pathologist employed by Dauphin County, testified as to the autopsy that he performed on Sims's body.  (<u>Id.</u> at 161-63).  Dr. Ross identified three gunshot wounds on Sims's body: one to the left back side of the head, one to the back of the left shoulder, and one to the left mid back.  (<u>Id.</u> at 164-65).  The autopsy revealed the presence of cocaine in Sims's blood and urine, though Dr. Ross testified that the level of cocaine in Sims's blood was .037 milligrams per liter, which is a "low level of cocaine" that indicated that "he had most probably ingested cocaine hours before his death."  (<u>Id.</u> at 166-67).  Dr. Ross recovered two bullets from inside Sims's body while performing the autopsy, but he was not able to find the bullet that caused the shoulder wound.  (<u>Id.</u> at 167-69).  Dr. Ross testified that the wounds on Sims's head and back were caused by "distant" gunshots, meaning that the gun was fired from at least 3-4 feet away.  (<u>Id.</u> at 168-70).  Dr. Ross concluded that the cause of Sims's death was "multiple gunshot wounds to the head and the back," (<u>id.</u> at 171), and that cocaine played no factor in Sims's death.  (<u>Id.</u> at 176).

James F. Rottmund, a corporal with the Pennsylvania State Police who the court admitted as a firearms expert, testified as to his examination of the bullets and cartridges found at the scene of the shooting.  (<u>Id.</u> at 178-83).  Rottmund testified that in his opinion all of the cartridge cases that were recovered from the scene had been fired by the same gun.  (<u>Id.</u> at 195).

At the conclusion of the law enforcement officials' testimony, the court heard testimony from Thomas Plummer, Sr.  (<u>Id.</u> at 223).  Plummer, Sr. testified that he spoke with Bracey after Sims's death while Bracey was detained in Dauphin

County Prison.  (Id. at 224).  Plummer, Sr. had come to the prison to visit Thomas Plummer, Jr., who was also incarcerated in the prison at the time.  (Id.)  While speaking with Bracey in the prison, Plummer, Sr. told Bracey to let him know if there was anything he could do to help.  (Id. at 224).  Because visiting hours in the prison were about to end for the day, however, Plummer, Sr. told Bracey to write him a letter.  (Id. at 224-25).

Plummer, Sr. subsequently received a letter that was purportedly sent by Bracey from Dauphin County Prison.  (Id. at 226-27).  After receiving the letter, Plummer, Sr. accidentally gave the letter to Plummer, Jr.'s defense attorney as part of a bundle of documents related to Plummer, Jr.'s pending criminal case.  (Id. at 228-29).  Plummer, Jr.'s attorney promptly turned the letter over to the Dauphin County District Attorney's office.  (Id. at 229).  Plummer, Sr. attempted to get the letter back, but Plummer, Jr.'s attorney explained that the letter could not be returned.  (Id.)

Plummer, Sr. testified to the contents of the letter as follows:

Q:    Could you read the letter to us, what it says?

A:    Received April 12, 1995, District Attorney's Office, Dauphin County.  Context of the letter.  What is up, Pop?  What is going on out there?  Here is how I am going to do this thing.  I was chilling, right, and a car pulled up, talking about, I sold him some bad shit.  And I told him it wasn't me.  And he started talking about what he was going to do to me and how he was going to kill me, and started going under his seat.  So I pulled out the gun and started shooting at the car and I couldn't stop.  How does that seem to you?  I need to know what to put on and take off, but it is going to be something like that.  I am going to tell them I don't want to go down on the 6th because I need time to look this case over, but if it goes down like this, all I can do is voluntary manslaughter, killing in the heat of passion following serious provocation or killing under justified circumstances.  Pops, I am doing all bits of homework.  I

> am trying to get a little five to ten, do half my time, like about three years, and I will be in a halfway house and be out before you know it.

(Id. at 233-34).  Plummer, Sr. acknowledged on cross-examination that he could not say with certainty that Bracey wrote the letter given that he had never seen Bracey's handwriting before receiving the letter.  (Id. at 239).  The Commonwealth rested its case at the conclusion of Plummer, Sr.'s testimony.  (Id. at 244).

Bracey presented the testimony of only one witness in his case in chief, Thomas Plummer, Jr., whom Bracey re-called to the stand.  (Id. at 244).  Plummer testified that on the night of Sims's death, he, Bracey, and Eggie were drinking beer and smoking marijuana.  (Id. at 245-46).  Plummer testified that all three individuals were drunk and high and that neither he nor Bracey would have been able to drive a car.  (Id. at 248-50).  Plummer also testified that he did not recall Bell being present for any statements that Bracey made at Rinell Sanford's home in the days following Sims's death and that Bell would not be telling the truth if he said that he was present for such statements.  (Id. at 251-52).

On cross-examination, government counsel impeached Plummer with prior inconsistent statements in which Plummer did not mention Bracey being drunk or high on the night of Sims's death and stated that he, Bracey, and Bell were all together at Sanford's home following Sims's death.  (Id. at 253-54).  Plummer reiterated on cross-examination that Bracey was the individual he had seen running after Sims's car while he heard gun shots.  (Id. at 254-55).

At the conclusion of trial, the jury convicted Bracey of first-degree murder on May 23, 1995, and Bracey was sentenced to life in prison.  See Commonwealth v.

Bracey, No. 1281 MDA 2017, 2018 WL 1886853, at *1 (Pa. Super. Ct. Apr. 20, 2018).

Bracey appealed, and the Pennsylvania Superior Court affirmed the judgment of

sentence on September 11, 1998.  Commonwealth v. Bracey, 726 A.3d 1075 (Pa.

Super. Ct. Sept. 11, 1998).  Bracey challenged his conviction through two petitions

for collateral relief under Pennsylvania's Post-Conviction Relief Act ("PCRA"), both

of which were denied.  See Bracey, 2018 WL 1886853, at *1.

In October 2010, Bracey's sister was conducting independent research on

Bracey's case when she discovered that the Commonwealth had not disclosed all of

the charges that had been pending against Plummer and Bell at the time they

agreed to testify against Bracey.  See (Doc. 2 at 2); Bracey v. Superintendent

Rockview SCI, 986 F.3d 274, 280 (3d Cir. 2021).  Bracey promptly filed a third PCRA

petition on December 1, 2010, asserting that the Commonwealth violated his due

process rights pursuant to Brady by failing to disclose all of Plummer and Bell's

charges.  See (Doc. 45-6); Commonwealth v. Bracey, No. 417 MDA 2011 (Pa. Super.

Ct. Nov. 3, 2011).  The Court of Common Pleas dismissed the petition on January 25,

2011, and Bracey appealed.  (See Doc. 45-6 at 4-5).

While Bracey's PCRA appeal was pending, he filed a petition for writ of

habeas corpus in this district on October 4, 2011.  Bracey v. Lamas, No. 3:11-CV-

1823 (M.D. Pa. Oct. 4, 2011).  United States Magistrate Judge Thomas M. Blewitt

recommended that the court dismiss the petition without prejudice for failure to

exhaust state court remedies.  Id. at Doc. 4.  Judge Kosik adopted the report and

recommendation on October 31, 2011 and dismissed the petition without prejudice

to Bracey's right to refile the petition after he had exhausted state court remedies. Id. at Doc. 5.

The Superior Court affirmed the dismissal of Bracey's third PCRA petition on November 3, 2011. (See Doc. 45-6). Bracey promptly filed the instant petition on November 29, 2011, and the court received and docketed the petition on December 16, 2011. (Doc. 1). Judge Blewitt recommended that the petition be dismissed as untimely. (Doc. 12).

Judge Kosik adopted the recommendation over Bracey's objections on August 8, 2012, dismissing the petition as untimely. (Doc. 15). Judge Kosik reasoned that under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the one-year limitations period for Bracey's petition began to run on October 12, 1998, the date on which his judgment of sentence became final by the conclusion of direct review. (Id. at 6 (citing 28 U.S.C. § 2244(d)(1)(A)). Because the limitations period was statutorily tolled from March 30, 1999 to September 14, 2001 Judge Kosik concluded that the petition needed to be filed no later than March 28, 2002 to comply with the statute of limitations and that Bracey's November 29, 2011 petition was therefore untimely. (Id.)

Bracey asserted that October 12, 1998, was not the correct starting point for the limitations period and that the limitations period instead began in October 2010, the date on which the factual predicate of his claim could have been discovered through the exercise of due diligence pursuant to 28 U.S.C. § 2244(d)(1)(D). (Id.) Judge Kosik rejected this argument, finding that "[t]he factual predicate to Petitioner's Brady claim could have been discovered through the exercise of due

11

diligence well before October of 2010." (Id. at 7).  Judge Kosik noted that Bracey was aware at the time of trial that both Plummer and Bell were testifying against him based on negotiated plea agreements and that both witnesses testified to their charges and agreements during trial.  (Id.)  Based on this fact, Judge Kosik concluded that Bracey "could have discovered the full extent of the deals and sentences prior to October 2010."  (Id. at 8).  Judge Kosik additionally found that Bracey was not entitled to equitable tolling of the limitations period and accordingly dismissed the petition as untimely.  (Id. at 13).  Bracey sought leave to appeal, but both Judge Kosik and the Third Circuit declined to issue a certificate of appealability.  (Docs. 15, 21).

Three years later, the Third Circuit issued its en banc decision in Dennis, which clarified that "the concept of 'due diligence' plays no role in the Brady analysis."  834 F.3d at 291.  Thus, defendants and defense counsel are "entitled to presume that prosecutors have 'discharged their official duties,'" and are not obligated to "scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed."  Id. at 290 (quoting Banks v. Dretke, 540 U.S. 668, 695-96 (2004)).  Any consideration of defense counsel's diligence with respect to a Brady claim, the court held, is "an unwarranted dilution of Brady's clear mandate."  Id. at 293.

On November 3, 2016, Bracey moved to reopen the case pursuant to Federal Rule of Civil Procedure 60(b)(6) in light of the Third Circuit's holding in Dennis. (Doc. 26).  Judge Kosik denied the motion on December 12, 2016 without discussing Dennis.  (Doc. 27).  Bracey appealed.  (Doc. 28).

On appeal, a divided panel of the Third Circuit vacated and remanded for further proceedings on Bracey's Rule 60(b)(6) motion. Bracey, 986 F.3d at 97-98. The court noted that Dennis "effected a material change in Circuit law with respect to the reasonable expectations of a Brady claimant" by clarifying that a defendant "can reasonably expect—and is entitled to presume—that the government fulfilled its Brady obligations because the prosecution's duty to disclose is absolute and in no way hinges on efforts by the defense." Id. at 279.  Although "Dennis did not involve § 2244(d)(1)(D) directly and did not alter that provision's requirement that a petitioner exercise 'reasonable diligence in the circumstances,'" id. at 290 (quoting 28 U.S.C. § 2244(d)(1)(D)), the case "materially altered what a petitioner in Bracey's 'position would have reasonably expected.'" Id. at 291 (internal alterations omitted) (quoting Wilson v. Beard, 426 F.3d 653, 661 (3d Cir. 2005)).  Thus, the court held that in light of Dennis, "a habeas petitioner's Brady claim is timely under § 2244(d)(1)(D) so long as it is filed within one year of the date on which the petitioner has reason to believe that the prosecution may have violated its duty of disclosure." Id. at 293.

Because Dennis "changed the relevant decisional law on which the dismissal of Bracey's underlying habeas petition rested" and altered what a petitioner in Bracey's position would have reasonably expected, the Third Circuit concluded that the district court should have analyzed the impact of Dennis prior to denying

Bracey's motion to reopen the case. <u>Id.</u> at 294-98. The court accordingly remanded the case for appropriate consideration of Bracey's motion.[3] <u>Id.</u> at 297-98.

Following remand, the case was reassigned to the undersigned on June 25, 2021. We appointed counsel to represent Bracey and scheduled an evidentiary hearing. (<u>See</u> Docs. 36, 38, 40). On February 16, 2022, Bracey's counsel moved, with the concurrence of opposing counsel, to cancel the evidentiary hearing and to provide a stipulated factual record in lieu of a hearing. (Doc. 43). We granted the motion on February 16, 2022, canceled the hearing, and set a schedule for the submission of a stipulated record and supplemental briefing. (Doc. 44). The parties filed the stipulated record and all briefs in accordance with the court-imposed schedule. (<u>See</u> Docs. 45-49). Bracey's Rule 60(b)(6) motion is now ripe for review.

## II.    <u>Discussion</u>

Bracey's motion seeks relief pursuant to Federal Rule of Civil Procedure 60(b)(6), which allows a district court to grant relief from a final judgment for any reason "that justifies relief." FED. R. CIV. P. 60(b)(6). Our court of appeals has succinctly summarized the legal standard that we must apply in reviewing Bracey's motion. <u>See</u> <u>Bracey</u>, 986 F.3d at 284. The court may grant relief under Rule 60(b)(6) "in extraordinary circumstances where, without such relief, an extreme and

---

[3] Judge Phipps, concurring in part and dissenting in part, agreed with the majority's threshold holdings that habeas corpus petitioners must obtain certificates of appealability to appeal the denial of Rule 60(b) motions and that a certificate of appealability was properly granted in this case, but dissented with respect to the majority's decision to vacate the denial of Bracey's Rule 60(b) motion. <u>Id.</u> at 298 (Phipps, J. concurring in part and dissenting in part).

unexpected hardship would occur." Id. (quoting Cox v. Horn, 757 F.3d 113, 120 (3d Cir. 2014)).  The petitioner bears the burden to show that he is entitled to relief under Rule 60(b)(6), but the court "must consider the full measure of any properly presented facts and circumstances attendant to the [petitioner's] request." Id. (alteration in original) (quoting Cox, 757 F.3d at 120).

When a petitioner's claim for relief under Rule 60(b)(6) is based on intervening changes in law, the court must analyze "whether the asserted change is material to the basis on which the district court initially denied habeas relief." Id. (citing Norris v. Brooks, 794 F.3d 401, 404-05 (3d Cir. 2015).  If the change in law is material, we must analyze the motion in accordance with the multifactor analysis outlined in Cox, 757 F.3d at 113.  Bracey, 986 F.3d at 284.

On the first point, our court of appeals has already concluded that Dennis was material to the dismissal of Bracey's petition because it clarified that a defendant "can reasonably expect—and is entitled to presume—that the government fulfilled its Brady obligations because the prosecution's duty to disclose is absolute and in no way hinges on efforts by the defense." Id. at 279.  This conclusion constitutes the law of the case, and we are bound to follow it.  Hence, we turn to the analysis of Bracey's motion required by Cox, 545 U.S. at 524.

In Cox, the Third Circuit noted that "intervening changes in the law *rarely* justify relief from final judgments under 60(b)(6)." Cox, 757 F.3d at 121 (emphasis in original) (citing Reform Party of Allegheny Cty. v. Allegheny Cty. Dep't of Elections, 174 F.3d 305, 311 (3d Cir. 1999) (en banc)).  Rule 60(b)(6) relief is rarer still in the habeas corpus context, especially when the request for relief is based on changes in

federal procedural law.  Id. at 125 (citing Gonzalez v. Crosby, 545 U.S. 524, 535-36 & n.9 (2005)).

Nevertheless, the court of appeals has "not foreclosed the possibility that a change in controlling precedent, even standing alone, might give reason for 60(b)(6) relief."  Id. (citing Wilson v. Fenton, 684 F.2d 249, 251 (3d Cir. 1982) (per curiam)). When reviewing a Rule 60(b)(6) motion based on a change in law, the court must conduct a flexible, multifactor approach that considers all the facts, circumstances, and equitable factors of the petitioner's case in addition to the relevant change in law.  Id.  "The ultimate question is whether the petitioner has shown 'extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur.'"  Bracey, 986 F.3d at 295 (quoting Cox, 757 F.3d at 115).

In considering the totality of the circumstances of the petitioner's motion, the court should consider "the effect of the change in decisional law on the district court's prior ruling," the merits of the petitioner's underlying claim for habeas corpus relief, principles of finality and comity, the petitioner's diligence in pursuing review, and, where appropriate, the imperative of correcting an unjust incarceration.  Id. (citing Cox, 757 F.3d at 122-26).

Upon review of Bracey's motion in light of the factors outlined in Cox and the other circumstances presented by Bracey's motion, we find that relief under Rule 60(b)(6) is not warranted.  As we explain in more detail below, nearly all of the Cox factors weigh against reopening this case, and Bracey has not presented other extraordinary circumstances that warrant relief.

First, although <u>Dennis</u> had a substantial effect on the court's prior ruling dismissing Bracey's petition, the change in law that <u>Dennis</u> announced is not extraordinary.  As the Third Circuit explained, <u>Dennis</u> "effected a material change in Circuit law with respect to the reasonable expectations of a <u>Brady</u> claimant" by clarifying that a defendant "can reasonably expect—and is entitled to presume— that the government fulfilled its <u>Brady</u> obligations because the prosecution's duty to disclose is absolute and in no way hinges on efforts by the defense."  <u>Bracey</u>, 986 F.3d at 279.  If this principle of law had been applied by the court in its 2012 analysis, this case would not have been dismissed as untimely given that Bracey did not have reason to believe that a <u>Brady</u> violation occurred until his sister discovered Plummer and Bell's other charges in 2010.  <u>See id.</u> at 293 (holding based on <u>Dennis</u> "that a habeas petitioner's <u>Brady</u> claim is timely under § 2244(d)(1)(D) so long as it is filed within one year of the date on which the petitioner has reason to believe that the prosecution may have violated its duty of disclosure").  As the Supreme Court recognized in <u>Gonzalez v. Crosby</u>, however, an after-the-fact change in decisional law interpreting AEDPA's one-year statute of limitations is not by itself an extraordinary circumstance.  <u>See Gonzalez</u>, 545 U.S. at 534-35.

In <u>Gonzalez</u>, the district court dismissed the petitioner's habeas corpus petition as untimely, finding that under then-controlling circuit precedent, the limitations period for the petition was not tolled during the pendency of petitioner's second request for state post-conviction relief.  <u>Id.</u> at 527.  The Supreme Court subsequently held in <u>Artuz v. Bennett</u>, 531 U.S. 4 (2000), "that an application for state postconviction relief can be 'properly filed'" for purposes of AEDPA "even if

the state courts dismiss it as procedurally barred." <u>Gonzalez</u>, 545 U.S. at 527 (citing <u>Artuz</u>, 531 U.S. at 8-9).  The petitioner moved to reopen his case pursuant to Rule 60(b)(6), contending that <u>Artuz</u> called into question the precedent on which his petition was dismissed and therefore constituted an extraordinary circumstance warranting Rule 60(b)(6) relief.  <u>Id.</u> at 527.  The district court denied the motion and the Eleventh Circuit upheld the denial.  <u>Id.</u> at 527-28.  The petitioner appealed to the Supreme Court, but the Court rejected his contention that the change in law announced by <u>Artuz</u> constituted an extraordinary circumstance.  <u>Id.</u> at 536.  As the Court reasoned, "[t]he District Court's interpretation was by all appearances correct under the Eleventh Circuit's then-prevailing interpretation of 28 U.S.C. § 2244(d)(2).  It is hardly extraordinary that subsequently, after petitioner's case was no longer pending, this Court arrived at a different interpretation."  <u>Id.</u>

This case is analogous to <u>Gonzalez</u>.  The court's 2012 dismissal of Bracey's petition was correct in view of then-controlling circuit precedent indicating that a petitioner's <u>Brady</u> claim would fail if it was based on the government's failure to disclose evidence that the petitioner could himself have discovered through reasonable diligence.  <u>See</u> <u>Bracey</u>, 986 F.3d at 290 n.14 (noting that controlling circuit precedent prior to <u>Dennis</u> "made clear that <u>Brady</u> does not compel the government 'to furnish a defendant with information which with any reasonable diligence, he can obtain himself." (internal alterations and quotation marks omitted) (quoting <u>United States v. Pelullo</u>, 399 F.3d 197, 213 (3d Cir. 2005))).  "It is hardly extraordinary that subsequently, after petitioner's case was no longer pending, [the Third Circuit] arrived at a different interpretation" of the principles

18

underlying AEDPA's one-year statute of limitations in its en banc decision in
Dennis.  See Gonzalez, 545 U.S. at 536.

Our review of the merits of Bracey's underlying habeas corpus claim also
militates in favor of denying his motion.  Bracey's claim is that the Commonwealth
violated Brady by failing to disclose some of the charges that Plummer and Bell
were facing when they agreed to testify against Bracey.  (See Doc. 1 at 5).

Under Brady, suppression of evidence that is favorable to a defendant and
material to the defendant's guilt or punishment violates the defendant's right to due
process.  Brady, 373 U.S. at 87.  Brady applies to both exculpatory evidence and
evidence that could be used to impeach witnesses.  See Bracey, 986 F.3d at 285 n.10;
Giglio v. United States, 405 U.S. 150, 154 (1972).  There are three components to a
Brady violation: (1) the evidence at issue "must be favorable to the accused, either
because it is exculpatory, or because it is impeaching"; (2) the evidence "must have
been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice
must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  To establish
prejudice, the petitioner must establish a reasonable probability that a different
result would have occurred if the evidence had not been suppressed.  Id. at 291.  A
mere possibility of a different result is not sufficient.  Id.  A reasonable probability
occurs when suppression of the evidence 'undermines confidence in the outcome of
the trial.'"  Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting United States v.
Bagley, 473 U.S. 667, 678 (1985)).

Analysis of a Brady claim is "legally simple but factually complex," because
the court must examine the relevant evidence in light of the entire trial record and

determine whether there is a reasonable probability that disclosure of the evidence would have led to a different result.  Turner v. United States, 137 S. Ct. 1885, 1893 (2017).  "The materiality of Brady material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." Lesko v. Sec'y Pa. Dep't of Corrs., 34 F.4th 211, 229 (3d Cir. 2022) (quoting Johnson v. Folino, 705 F.3d 117, 129 (3d Cir. 2013)).

Suppressed evidence that could impeach a witness may still be material even if the witness was impeached with other evidence.  See, e.g., Turner, 137 S. Ct. at 1895; Wearry v. Cain, 577 U.S. 385, 393 (2016).  But impeachment evidence is generally not considered material if it is cumulative of similar impeachment evidence that was introduced at trial.  Lesko, 34 F.4th at 231 (quoting Johnson, 705 F.3d at 129); United States v. Friedman, 658 F.3d 342, 358 (3d Cir. 2011).

Based on the evidence adduced by the parties, it appears that the additional undisclosed charges against Plummer and Bell would be favorable to Bracey as impeachment evidence.  See Giglio, 405 U.S. at 154-55 (holding that evidence of agreement not to prosecute witness in exchange for witness's testimony constituted impeachment evidence that was favorable to the accused).  It also appears that the Commonwealth suppressed this evidence in violation of Brady.  See Wilson v. Beard, 589 F.3d 651, 663-64 (3d Cir. 2009) ("the fact that a criminal record is a public

document cannot absolve the prosecutor of her responsibility to provide that record to defense counsel."); <u>accord</u> <u>Dennis</u>, 834 F.3d at 292.[4]

It does not appear, however, that the additional undisclosed charges against Plummer and Bell were material to Bracey's guilt or punishment.  Both Plummer and Bell were heavily impeached at trial with evidence they had reached plea agreements in exchange for their testimony, (<u>see</u> Doc. 45-1 at 76, 104-05), and impeachment evidence that is cumulative of similar impeachment evidence is generally not considered material.  <u>Lesko</u>, 34 F.4th at 231.

Additional impeachment of Plummer and Bell would also have no effect on the testimony of Milagros Torres and Jacqueline Jackson, both of whom testified that they saw Bracey shooting at Sims's car.  (<u>See</u> Doc. 45-1 at 29-30, 34-36, 56-57, 65-66).  That testimony, combined with Torres and Jackson's contemporaneous identification of Bracey as the shooter—Torres based on recognizing Bracey from the neighborhood and Jackson based on her existing relationship with Bracey and conversation immediately after the shooting, (<u>see</u> <u>id.</u> at 34-36, 56-57, 66-69)—would likely be enough to sustain confidence in the verdict regardless of whether additional evidence impeaching Plummer and Bell was introduced.  <u>See</u> <u>Smith v. Cain</u>, 565 U.S. 73, 76 (2012) ("[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." (citing <u>United States v. Agurs</u>, 427 U.S 97, 112-13 (1976))).

---

[4] Respondent argues that "the Commonwealth, by definition, cannot suppress evidence that is publicly available."  (Doc. 47 at 13).  This argument is plainly contrary to the Third Circuit's holdings in <u>Wilson</u> and <u>Dennis</u>.

Bracey argues that there is a reasonable probability that the additional impeachment evidence would have produced a different outcome by leading the jury to convict him of third-degree murder rather than first-degree murder. (Doc. 46 at 17).  This argument tracked his strategy at trial, which sought a conviction for third-degree murder rather than first-degree murder "based on Mr. Bracey's intoxication and [the] perceived threat posed by Houston Sims." (Id. at 3).

We are not persuaded that additional impeachment of Plummer and Bell could have reduced Bracey's conviction to third-degree murder.  A significant quantum of evidence—independent of Plummer and Bell's testimony—supported the jury's conclusion that Bracey killed Sims in a premeditated fashion.  First, eyewitness testimony from Jackson indicated that Bracey shot at Sims as Sims was driving away from him.  (Doc. 45-1 at 66).  Second, testimony from Dr. Ross corroborated Jackson's account that Bracey had shot Sims from behind.  Dr. Ross testified that all three bullet wounds Sims had suffered were on the back of his body and that they were caused by distant gunshots fired from at least 3-4 feet away.  (Id. at 164-65, 168-70).  Third, testimony from Leroy Lucas that no guns were found in Sims's car undermined Bracey's account that he had seen Sims reaching for a gun. (See id. 154).  Fourth, testimony from Thomas Plummer, Sr. regarding the letter he received from Bracey supported an inference that Bracey fabricated his account of Sims posing a threat to him in order to avoid conviction for first-degree murder. (See id. at 233-34).  Finally, the only evidence that Bracey was intoxicated on the night of Sims's murder was Plummer's testimony to that effect.  (See id. at 248-50).

22

Additional impeachment of Plummer's credibility would thus have hurt, rather than helped, Bracey's intoxication theory.

In light of all the evidence tending to show that the suppressed impeachment evidence was not material to Bracey's guilt or punishment, we conclude that the merits of Bracey's claim do not support his request for Rule 60(b)(6) relief.

Principles of finality and comity also weigh against granting relief. Federal courts must "pay ample respect to states' criminal judgments" and should be particularly reluctant to disturb those judgments via Rule 60(b) relief. Cox, 757 F.3d at 125. "In that vein, a district court reviewing a habeas petitioner's 60(b)(6) motion may consider whether the conviction and initial federal habeas proceeding were only recently completed or ended years ago. Considerations of repose and finality become stronger the longer a decision has been settled." Id. (citing Gonzalez, 545 U.S. at 536-37). Bracey's conviction and sentence became final nearly thirty years ago in 1995, and his habeas corpus petition had been dismissed for four years before Dennis was decided.

Finally, Bracey's diligence in pursuing his Dennis claim weighs in favor of granting relief, as he promptly pursued relief shortly after Dennis was decided. His diligence alone, however, is not sufficient for us to find the extraordinary circumstances necessary to grant relief under Rule 60(b)(6). The weight of all other factors is decidedly against a finding of extraordinary circumstances.

**III.**   <u>**Conclusion**</u>

We will deny Bracey's motion for relief from judgment under Federal Rule of Civil Procedure 60(b)(6).  A certificate of appealability will not issue because jurists of reason would not debate the correctness of this procedural ruling.  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  An appropriate order follows.

<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    September 8, 2022